Janice E. BAXTER, Plaintiff-Respondent,†

v.

Wisconsin DEPARTMENT OF NATURAL
RESOURCES, Paulette J. Harder, Carroll Besadny,
Richard A. Fox, Suzan Beth Shea, and Marlys L.
Foley, Defendants-Appellants.

Court of Appeals

*No. 90–1359. Oral argument February 18, 1991.—Decided
October 24, 1991.*

(Also reported in 477 N.W.2d 648.)

†Petition to review denied.

For the defendants-appellants the cause was submitted on the briefs of *James E. Doyle,* attorney general, with *Robert D. Repasky* and *Michael J. Losse,* assistant attorney generals. Oral argument by *Robert D. Repasky.*

For the plaintiff-respondent the cause was submitted on the briefs of *Michael R. Fox* and *Mary E. Kennelly* of *Fox & Fox, S.C.* of Madison. Oral argument by *Michael R. Fox.*

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J.    Janice Baxter, plaintiff, brought a civil action under 42 U.S.C. sec. 1983 and 29 U.S.C. sec. 794 (Rehabilitation Act of 1973)[1] charging that the defendants failed to accommodate her handicap, mental depression, and unlawfully terminated her employment because of her handicap. Defendants are Carroll Besadny, the Secretary of the Department of Natural Resources, Paulette Harder, department administrator, Richard Fox, a departmental director, and two supervisors, Suzan Shea and Marlys Foley. It is undisputed that the defendants must comply with federal regulations providing that federal fund recipients "shall make reasonable accommodation to the known physical or mental limitations" of handicapped employees. 45 C.F.R. sec. 84.12 (1990).

The defendants moved for summary judgment dismissing the complaint for damages on grounds that they are immune from suit. The trial court denied the motion

---

[1] 29 U.S.C. sec. 794 states in part:

No otherwise qualified individual with handicaps in the United States, as defined in section 7(8), shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ..

because it believed material issues of fact were disputed.[2] We granted defendants' petition for leave to appeal. Section 808.03(2), Stats.[3]

This action is brought because of defendants' discretionary decisions. Government officials enjoy qualified immunity from suit for damages arising out of discretionary functions. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Immunity is favored. *Melton v. City of Oklahoma City,* 879 F.2d 706, 728–29 (10th Cir. 1989), *modified on reh'g en banc,* 928 F.2d 920, *cert. denied,* 112 S. Ct. 296 (1991). "[Qualified immunity] provides ample protection to all but the plainly incompetent or those who knowingly violate the law . . .. [I]f [officials] of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

[2]On June 26, 1990, the trial court entered a decision in which it declared that the claim for damages against the various defendants in their official capacities was barred by sovereign immunity, and the issue is not before us.

[3]An order denying a motion to dismiss is not final. Section 808.03(1), Stats. However, if the motion to dismiss is based on a claim to qualified immunity, an order denying the motion will usually satisfy the criteria for granting a petition for leave to appeal under sec. 808.03(2), Stats. The critical nature of qualified immunity is such that an order denying such a motion is treated as immediately appealable under the federal rules. *See Mitchell v. Forsyth,* 472 U.S. 511, 526–27 (1985) ("[Qualified immunity] is an *immunity from suit* rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial . . .. [T]he denial of qualified immunity should be [immediately] appealable . . ..") (emphasis in original).

The issue here is whether the decisions the defendants made before Baxter was discharged were such that they reasonably could have believed that they had satisfied the "reasonable accommodation" requirement in 45 C.F.R. sec. 84.12.[4] We hold that the defendants could have reasonably so believed. We therefore hold that the defendants are immune from suit for damages, we reverse the order from which they appeal, and remand with directions to dismiss the complaint for damages.[5]

Summary judgment is governed by sec. 802.08, Stats. If the defendants have made a *prima facie* showing that they are entitled to qualified immunity—a defense which would defeat the plaintiff—then we must examine the record to determine whether material facts are in dispute. If not, the defendants are entitled to

[4]We do not decide whether, in fact, the defendants reasonably accommodated Baxter. Whether they did or not is irrelevant to the question of qualified immunity. In *Anderson v. Creighton,* 483 U.S. 635, 641 (1987), an FBI agent made an unlawful search, but the court said he could still be entitled to summary judgment on the qualified immunity issue if he could show that a reasonable agent could have believed the search to be lawful. *See also, Rakovich v. Wade,* 850 F.2d 1180, 1214 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968 (1988) ("This is not a decision that the officers infringed no first amendment interests of Rakovich, but is instead a decision that, whether or not such an infringement occurred, a reasonably well-trained officer could believe that his conduct did not violate a clearly established right"). So, for the purposes of qualified immunity analysis, we can assume that the defendants did not reasonably accommodate Baxter.

[5]Under *Harlow,* qualified immunity "applies only to claims for civil damages and does not diminish the availability of equitable remedies such as a declaratory judgment or an injunction." *Rothschild v. Grottenthaler,* 716 F. Supp. 796, 802 n.8 (S.D.N.Y. 1989), *modified on other grounds,* 907 F.2d 286 (2nd Cir. 1990).

dismissal of the complaint for damages. *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473, 476–77 (1980).

The undisputed facts are as follows: Baxter suffers from severe depression. She has had psychiatric care since approximately 1982. In 1983, she received vocational counseling and training at Goodwill Industries where her caseworker was Al Pedracine.

In 1984, Baxter passed a civil service exam for the position of Word Processing Operator I with the Department of Natural Resources (DNR). Through the use of an expanded register based on handicap, she was certified for employment. Foley interviewed and hired her in September 1984. She asked Foley if she could have time off on Tuesday mornings to see her psychiatrist. Foley said that she could come in late on Tuesdays and stay late to complete her work. Shea approved that arrangement.

Baxter saw Pedracine on a regular basis. Pedracine told Shea that he was providing Baxter with vocational assistance and asked to be kept apprised of her progress. Shea agreed to keep him informed.

Baxter took advantage of the DNR's Employee Assistance Program. Foley and Shea met with Robert Weclew, who headed the program, regarding Baxter's condition and asked him for advice. Over the following months, Weclew spent much of his time with Baxter.

Foley provided Baxter with training manuals. Despite that and her prior experience, Baxter had difficulty grasping the basic commands of the word processing program.

At Baxter's two-month evaluation, Foley told her that she was well below the standard line-count of 125/130 lines per hour for her position. She averaged about 30 lines per hour. Foley rated her as "unsatisfactory" for productivity and ability to learn, "needs improvement"

for working without supervision, office conduct and work habits, and "satisfactory" for accuracy, neatness, attitude toward job, ability to get along with others, punctuality, and absenteeism. Upset by her evaluation, Baxter told Foley that she "had no desire to go on in life if [she] could not succeed in the job."

Shea told Pedracine about Baxter's poor performance evaluation. Pedracine said he would talk to Baxter and told Shea that he could provide a job coach at no cost to the DNR. Shea said that a job coach would not be necessary.

On January 4, 1985, Baxter received her second performance evaluation. She had improved in several areas, was no longer "unsatisfactory" in any area, and her line-count had doubled since her first evaluation. Shea told Pedracine about Baxter's improvement.

On February 27, about two weeks before the end of Baxter's probation, Foley and Shea decided not to offer Baxter a permanent position. In short, her job would be terminated. The primary reason for termination was her lack of productivity. Her line-count was only a little over half what was required. Foley also said that Baxter had problems following directions.

On March 1, Shea told Pedracine that she and Foley would meet with Baxter that day to tell her that she had not passed probation. After telling Baxter she had not passed, Shea and Foley told Weclew that Baxter's employment had been terminated. Pedracine met with Baxter the same day and informed her psychiatrist's office of the termination. Upon returning home, Baxter attempted suicide.

On March 18, Harder convened a meeting with Shea, Foley, Weclew, Pedracine, Baxter and Baxter's husband. After the meeting, Baxter was offered a limited term position, which she accepted. At the end of the

limited term period, Baxter left without requesting reassignment.

We turn to the law. The Rehabilitation Act of 1973 (Act) prohibits discrimination against an "otherwise qualified" handicapped individual by recipients of federal funds "solely by reason of her or his handicap." 29 U.S.C. sec. 794. An "otherwise qualified" individual is "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406 (1979).

However, "[w]hen a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n.17 (1987).

Baxter argues that when she was terminated in 1985, the Act and the regulations clearly established, and a reasonable person would have known, that she was to be accommodated on account of her handicap, mental depression. We agree. The basic requirement of "reasonable accommodation" was clearly established at the time of Baxter's dismissal. The Act was enacted in 1973, amended in 1978, and the regulations were promulgated in 1977. By 1985, the Act had been litigated extensively. A federal district court has noted: "In 1985 and thereafter, a reasonable person should have known the requirements of the Act: that governmental units that received federal financial assistance were required to make reasonable modifications to the demands of a job or its working conditions to accommodate persons with handicaps . . .." *Pecinovsky v. City of Lancaster,* 55 Fair Empl. Prac. Cas. (BNA) 575, 579 (W.D. Wis. 1991).

But, although by 1985 the "reasonable accommodation" requirement was clearly established, clarity ended there. The meaning of "reasonable accommodation" was not clearly established.[6] "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). To defeat a qualified immunity claim, "reasonable accommodation" must be a right laden with some detail and substance and not "exist only generally in the air . . .." *Eng v. Coughlin,* 858 F.2d 889, 895 (2nd Cir. 1988).

Baxter offers specifics. According to Baxter, the defendants should have used three accommodations in order to comply with the requirement of "reasonable accommodation."[7] According to Baxter, the defendants should have: (1) Provided her with Pedracine's job coach; (2) extended her probation for three months; and (3) informed Pedracine and Weclew more closely of her

---

[6]In 1986, a commentator noted that "[t]he standards by which to decide Section 504 [29 U.S.C. sec. 794] cases are still at an early stage of development. Much of the early litigation dealt with" matters other than the meaning of "reasonable accommodation." Russell A. Janis, *A Unified Theory For Section 504 Employment Discrimination Analysis: Equivalent Cost-Based Standards For "Otherwise Qualified" and "Reasonable Accommodation,"* 43 Wash. & Lee L. Rev. 63, 65 (1986). Hence our reluctance to adopt *Pecinovsky's* statement on the status of the law in 1985.

[7]It does not appear from the record that Baxter actually requested these accommodations. Our analysis, though, is not dependent on the resolution of that issue.

progress. Assuming these accommodations may be reasonable, the issue is whether a reasonable official could believe that Baxter's termination was lawful even though these accommodations were not made. A reasonable official could have so believed in 1985.

Baxter cites no cases to support her claim to the proposed accommodations. Instead, she bases her argument for a job coach on 45 C.F.R. sec. 84.12(b) which provides in relevant part: "Reasonable accommodation may include: . . . (2) job restructuring, part-time or modified work schedules . . . the provision of *readers or interpreters, and other similar actions.*" (Emphasis added.) However, this part of the regulation is "neither all-inclusive nor meant to suggest that employers must follow all of the actions listed." 45 C.F.R. sec. 84, Appendix A, p. 365 (1990). Providing "readers or interpreters" or "other similar actions" is directory, not mandatory.

Moreover, Baxter equates readers and interpreters with job coaches. We do not. Readers are provided to the blind and interpreters to non-English speaking employees on account of handicap. The nexus between those accommodations and those handicaps is immediately apparent. Persons who are blind may not be able to perform their job skills without readers. The same is true of interpreters for non-English speaking employees. But no nexus is shown between Baxter's mental depression and a job coach. It cannot be said that the defendants should have known, based on the applicable regulation, that to terminate Baxter's position without providing her with a job coach would violate the regulation.

Baxter argues from the regulation's reference to "job restructuring" and "part-time or modified work sched-

ules" that her probation should have been extended. We disagree. Those terms do not imply, much less require, an extension of probation. Indeed, "modified work schedules" suggests an accommodation that the defendants provided. They gave Baxter time off to see her psychiatrist.

We reject Baxter's contention that the defendants should have been in closer contact with Pedracine and Weclew. Baxter points to Shea's promise to Pedracine that she would keep him informed of Baxter's progress. No statute, regulation or case law established in 1985 that such a promise was a reasonable accommodation. In any event, we do not understand how telling Pedracine about Baxter's progress was anything more than informational. What Pedracine would do with the information was for him to decide. Providing the information had no effect on Baxter's duties.

The term "reasonable accommodation" did not clearly establish Baxter's right to a job coach or probation extension. That term and the regulations surrounding it cannot fairly be read as clearly establishing any such rights.[8]

---

[8]The question of whether some "reasonable accommodation" is available has been characterized as a "rather mushy" question. *Brennan v. Stewart,* 834 F.2d 1248, 1262 (5th Cir. 1988). Lawyers have problems interpreting the provisions of the Rehabilitation Act. "When the lawyers are incapable of recognizing and properly arguing the law, we think it doubtful that the law can be considered 'clearly established' from the point of view of the clients." *Id.* at 1262 n.25. Judges have problems too. "[T]he regulations issued under the Rehabilitation Act of 1973 . . . are general in nature and . . . have been the subject of inconsistent judicial interpretation . . . .." Elliot H. Shaller, *"Reasonable Accommodation" under*

However, because the basic requirement of "reasonable accommodation" was clearly established by 1985, if the defendants failed to make any effort to accommodate Baxter's handicap, then they as reasonable persons could not believe that her dismissal was lawful. They did attempt to accommodate her depression. They modified her work schedule so that she could see her psychiatrist. They told her about the DNR's Employee Assistance Program and met with Weclew about Baxter's condition. They knew that she was receiving help for her handicap from three counselors. They provided her with instruction, although the type they provided is disputed. These were not the efforts of the "plainly incompetent" or of knowing violators of the law. *Malley,* 475 U.S. at 341.

In sum, we cannot say that the boundaries of the "reasonable accommodation" right were sufficiently definite so that the defendants understood that their action violated that right or, in other words, that the unlawfulness of dismissing Baxter was evident. *Eng,* 858 F.2d at 895. They could reasonably believe that their efforts satisfied the accommodation requirement and that further efforts were unnecessary. They were not required to follow directions from Baxter for further accommodations.[9]

---

the Americans with Disabilities Act—What Does It Mean?, 16 Employee Relations L.J. 431, 432 (1991).

[9]*See Matzo v. Postmaster General,* 685 F. Supp. 260, 264 (D.C.D.C. 1987) (mem.), *aff'd without opinion,* 861 F.2d 1290 (D.C. Cir. 1988) ("A handicapped employee cannot dictate the measure of his employer's duty to accommodate . . . even if [the employee's demand], too, might have been reasonable"); *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) (a Title VII case in which the court found no legal basis for "requiring an employer to choose any particular reasonable accommodation"). The employer should have leeway in determining the efficacy of avail-

We conclude that the defendants could reasonably believe that Baxter's dismissal was lawful in light of their efforts. Thus, the defendants are entitled to qualified immunity on summary judgment as long as there are no material issues of fact in dispute.[10]

If there are disputed material facts—facts on which the issue of qualified immunity turns—then we must affirm and the case proceed to trial on that and other issues. *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir. 1987). If not, then the defendants are entitled to qualified immunity on summary judgment.[11]

The factual disputes include whether Baxter had worked unauthorized overtime and during lunch breaks, whether Foley was courteous or impatient when assisting Baxter, and whether Baxter refused to type lease agreements. None of these factual issues is material to

---

able accommodations. Here, the defendants may have determined that, given Baxter's low productivity, further accommodations would not be useful.

[10]We are concerned about how the law will progress in this area if plaintiffs must overcome such a seemingly high standard as "clearly established law." However, if the standard were lowered our concern would shift to how public officials could protect themselves from liability when not knowing whether their discretionary actions were unlawful.

[11]"In many cases, where the material facts have not been disputed, courts have been able to determine whether qualified immunity is applicable as a matter of law without extensive proceedings . . . .. In most cases, we believe that, *as in the qualified immunity context,* the issue of whether the facts alleged by a [defendant] support its claim that it has met its duty of reasonable accommodation will be a 'purely legal one.' Only if *essential* facts were *genuinely* disputed or if there were *significantly* probative evidence of bad faith or pretext would further fact finding be necessary." *Wynne v. Tufts Univ. Sch. of Medicine,* 932 F.2d 19, 26 (1st Cir. 1991) (en banc) (emphasis added; citation omitted).

the qualified immunity issue. Our immunity analysis and conclusion stand regardless how those factual issues are resolved.

Baxter's low productivity was the primary reason for her dismissal. She asserts however that the defendants gave her work normally performed by an Operator II and therefore beyond the level expected for the position she sought. Foley deposed that she assigns work of all kinds, including second-level work, to entry-level operators such as Baxter. Foley does this to evaluate the operator's ability and to determine the areas in which the operator needs help. Since Baxter asserts that the time she spent on the second-level work slowed her development, a material factual dispute exists as to whether the type of work assigned to Baxter resulted in her low productivity.

While the dispute is one of material fact, we conclude that a *genuine* issue of material fact does not exist. Summary judgment may be granted only if "there is no genuine issue as to any material fact" and that the moving party is entitled to a judgment as a matter of law. Section 802.08(2), Stats. Thus, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

No reasonable jury could return a verdict for Baxter on the qualified immunity question merely by resolving the type-of-work dispute in her favor.[12] The defendants'

---

[12]We do not suggest that the qualified immunity issue is for the jury. The availability of the qualified immunity defense is a

practice was to give an entry-level operator some second-level work. But Baxter does not cite that practice as the reason for her failure to achieve the required line-count. She does not argue that the defendants should have forgone that practice to satisfy the reasonable accommodation requirement. When she complained, Shea and Foley made an effort to give her lower-level work. The dispute lacks the element of genuineness which would otherwise prevent summary judgment in the defendants' favor on the immunity question.

The type of training Baxter received is also in dispute. In her affidavit, Baxter states that "I did not receive adequate training. Foley and Sue Hoffman, the backup supervisor, gave me a training book and told me to read it but did not provide me with any personal one-on-one assistance." In Foley's affidavit, she states that, in addition to the training manuals, Baxter was "provided with training on a daily basis, and I would estimate I spent an average of two hours per day training and assisting her with problems she was experiencing."

The notes that Foley kept on Baxter's progress also contradict Baxter's statement. Foley wrote on October 5 that she "[s]at with [Baxter] most of the afternoon explaining how to do charts and how to use the glossary . . .." An entry dated November 13 states that Foley "worked with [Baxter] at various times since Oct. 30 on different aspects of the machine. Started [her] on Skills

---

question of law to be answered by the court with reference to the particular facts of the case. *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.), *cert. denied,* 488 U.S. 968 (1988). The clearly erroneous standard of review applies to factual findings by a trial court. Section 805.17, Stats. We see no need, however, to engraft that standard on the ruling in *Liberty Lobby* that a factual issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Building Book." Other entries by Foley also belie Baxter's assertion that no personal assistance was given. In her affidavit, Shea also states that Foley provided Baxter with daily training.

It is not disputed, however, that Baxter received training for her job. Baxter herself claimed that "[b]ased on my training at Goodwill and my experience with the Department of Transportation [where she was a word processor], I felt ready and qualified to perform the job of [word processing]." It is undisputed that training manuals and cassettes were given to her and that Foley answered her questions. It is undisputed that Foley gave Baxter two performance evaluations and told her of the expected line-count.

The dispute regarding the type of training Baxter received is immaterial to the qualified immunity issue. Baxter's training combined with the defendants' efforts at accommodation could lead a reasonable person to believe that Baxter's termination was lawful. The defendants are entitled to summary judgment on the issue of qualified immunity.[13]

We conclude this opinion with the reminder that the question of whether the defendants reasonably accommodated Baxter is not before us.[14] The only question before us, and which we have answered, is whether the defendants were entitled to qualified immunity, i.e., whether a reasonable person could believe that Baxter's termination was lawful in light of clearly established law.

---

[13]The parties argued about the significance of the manner in which the defendants dismissed Baxter and the limited-term position offered to and accepted by Baxter. In this case, neither of these issues have any bearing on the qualified immunity analysis.

[14]*See supra* note 4.

*By the Court.*—Judgment reversed and cause remanded with directions.